# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SUZANNE ALESHIRE, ) | |
| ) | |
| Debtor-Appellant, ) | No. 17 CV 617 |
| ) | Judge John J. Tharp, Jr. |
| v. ) | |
| ) | (Bankruptcy Case 15 BK 1652) |
| WELLS FARGO BANK, N.A., ) | |
| ) | |
| Creditor-Appellee. ) | |
| ) | |

## MEMORANDUM OPINION

This is an appeal from a bankruptcy court order dismissing the debtor's Chapter 11 petition without a confirmed reorganization plan. The bankruptcy court concluded, and this Court agrees, that dismissal was appropriate because the debtor had been given ample time to present a confirmable plan but failed to do so.

## I. BACKGROUND

The debtor in this case, Suzanne Aleshire, filed a bankruptcy petition under Chapter 11 on January 19, 2015. On Schedule A, a required listing of her assets, Ms. Aleshire indicated that she owned four properties, three located in Winnetka, Illinois (collectively, "the Winnetka properties"): (1) 1155 Chatfield Road; (2) 402 Willow Road;[1] and (3) 739 Walden Road. The fourth property is located at 26861 Hickory Blvd., in Bonita Springs, Florida. These properties were, in the aggregate, underwater: Aleshire valued the properties at $2.4 million and stated that

---

[1] Wells Fargo reports in its brief that a foreclosure sale of the Willow Road property was confirmed by the Cook County Circuit Court in case number 08 CH 37919 on September 12, 2017. Neither the parties nor the U.S. Trustee suggest that this sale has any bearing on Aleshire's appeal. The Court has considered whether the sale renders this appeal moot and concludes that it does not. Even assuming the disposition of the Willow Road property to now be moot, if Aleshire's petition should not have been dismissed, then there would still be work to do in the bankruptcy court with respect to consideration of a plan based on Aleshire's remaining assets.

she owed about $2.786 million on them. Her filings indicated that the remainder of her assets totaled less than $5,000 and that her income was $11,703 per month, with about $10,000 of that coming from rental income from the properties and the remainder from Social Security. She claimed monthly expenses of only $1,665, a figure that did not include items such as the mortgage payments and taxes owed on any of her properties, which was information expressly required by Schedule J.

When she filed her petition, Aleshire had not made a mortgage payment on any of the Winnetka properties in more than seven years. She stopped making payments in 2008, she says, on the (dubious) advice of counsel assisting her in a dispute with Harris Bank—not Wells Fargo—relating to an erroneous credit report Harris had issued (and which apparently was adversely affecting her ability to secure loan modifications from Wells Fargo). The particulars of that dispute are not clear from the record but neither are they relevant; the gist of the story is that Aleshire maintains that she tried to resume making payments to Wells Fargo several months later but was rebuffed and told to complete the loan modification process, prompting her to abandon her efforts to pay any amounts owed on the mortgages. The bottom line of this saga is that Aleshire's accounts with respect to each of the mortgages on the Winnetka properties were substantially in arrears when she filed the bankruptcy petition at issue in this appeal.[2]

Over the course of the two years in which her chapter 11 petition was pending in the bankruptcy court, Aleshire proposed three reorganization plans, none of which were accepted by

---

[2] The petition in this case is the third chapter 11 petition filed by Aleshire. She originally filed a chapter 11 petition in March 2011, which was dismissed on a motion by Harris Bank in May 2012. Aleshire promptly filed another chapter 11 petition in July 2012; that was converted to chapter 7 petition in February 2013. A. 129-30 (Wells Fargo appendix). In the chapter 7 proceeding, Aleshire obtained a discharge of various debts in June 2013, but not of the mortgage loans on the Winnetka properties. Amended Disclosure Statement, Bankr. Dkt. 127, at 10; *see also* Trustee Resp. Brief at 5.

her creditors. Aleshire's first plan filed contemporaneously with her petition, proposed that the "Debtor will continue to operate her properties and use the income generated from the rentals to continue to meet the terms of the Lender's First Mortgages on Confirmation," but provided no detail as to how she would be able to do so financially given her reported net monthly income of approximately $10,000. Aleshire filed a second proposed plan on October 1, 2015 (Dkt. 85) and her third amended plan on April 12, 2016 (Dkt. 118). In her third amended plan, Aleshire proposed to pay, among other things, $2,201 a month to the IRS,[3] $2,294 per month on the Willow Road property,[4] $2,690 per month on the Walden Road property,[5] and $2,683 a month

---

[3] The debt Aleshire owed to the IRS is not explained in the briefs, but it is identified in the plan as an allowed secured claim. Per the plan, payments would be made for 48 months. In addition, Aleshire's response to Wells Fargo's objections identifies an "IRS priority claim" distinct from the IRS secured claim, which required an additional payment of $233 per month. In her response to Wells Fargo's objections to the plan, Aleshire stated that she "hopes to reduce" the IRS obligation through an offer of compromise. Prior to dismissal of the case, she had provided no information about any compromise with the IRS and her briefs do not report that any such compromise has been negotiated.

[4] These payments on the Willow Road property were "interest only" payments for four years (subject to variable rate adjustments) to be followed by 30 years of principal and interest payments sufficient to pay off the mortgage. Further, this payment amount did not include required escrow payments; as reflected in Aleshire's response to Wells Fargo's objections to the plan, adding the required escrow to the interest only payment increased the required monthly payment to $4,193.36.

[5] These payments were interest only payments to be made for a year, at which time principal and interest payments would resume for the balance of 30 years. The initial monthly payment amount set forth above does not include required escrow payments of approximately $1,741 per month; thus, the total contemplated monthly payment regarding the Walden property over the first year of the plan would have been $4,431. Without explanation, however, Aleshire's response to Wells Fargo's objections to the plan states that the payment amount on the Walden property would be $4,011.

Also, as noted above, the Walden property was owned by a family trust, of which Aleshire was a beneficiary during her lifetime. Aleshire explained in her response to Wells Fargo's objections to the plan that her proposal as to the Walden property was to pay off what she unilaterally deemed to be the secured portion of the debt ($600,000) over 30 years, with any deficiency to be treated as unsecured debt. She reported on her Schedule A, however, that the secured claim on the Walden property was $896,929.50 (presumably the amount of unpaid

for the Florida property.[6] In addition, the plan contemplated that Wells Fargo would waive Aleshire's defaults as to the Chatfield property (Aleshire's residence) and that Aleshire would resume making payments as required under the terms of the mortgage loan on that property.[7]

Wells Fargo objected to the plan on a variety of specific grounds but all relating to the bank's view that the rental income generated by the properties, combined with Aleshire's other modest income, was not sufficient to cover the debt on the properties and failed to provide for reimbursement of pre- and post-petition property tax payments the bank had advanced. Aleshire responded to Wells Fargo's objections to the third amended plan by asserting that she had $16,986 in monthly income available to fund the plan (Dkt. 152 at 5); she did not identify the sources of that income or how she had increased her monthly income by more than $5,000 from the $11,703 she reported on Schedule A to the $16,986 figure represented in her response to Wells Fargo's objections. By Aleshire's reckoning, this plan gave her a surplus of some $400 per month. It did not, however, address the subject of property taxes that Wells Fargo had advanced.

In September 2016, Wells Fargo filed a motion to dismiss Aleshire's petition, arguing that her claim that she had almost $17,000 per month with which to fund the plan was "a red herring." According to Wells Fargo, the operating reports concerning the properties filed by Aleshire reflected that she was able to pay only an average of $2,190 per month, far less than

---

principal on the mortgage loan). Thus, in effect, Aleshire's proposal was to reduce the secured obligation on the Walden property by almost $300,000.

[6] This payment was based on a required principal and interest payment of $1,910.71 over five years and an escrow payment of $773.10. Thereafter, the principal and interest payment increased to $2,100.51 in year 6, and to $2,219.16 in years 7-21. According to the plan, the loan required a balloon payment of $130,789.42 to close out the mortgage after year 21.

[7] According to Aleshire's response to Wells Fargo's objections, her plan contemplated payments of $2,929 per month on the Chatfield property.

needed even to cover the mortgage payments on the properties.[8] The motion also argued that the operating reports showed that the Florida property lost more than $1,000 per month over the first 19 months of the case, which warranted dismissal on the ground that Aleshire's continuing operation of the properties was creating a "continuing loss to or diminution of the estate." 11 U.S.C. § 1112(b)(4)(A). Supplementing its first motion, Wells Fargo filed an additional motion to dismiss in November 2016, specifically alleging that Wells Fargo had paid more than $90,000 in post-petition property taxes on the Winnetka properties because Aleshire had failed to do so and that she lacked the resources to both fund the plan and repay Wells Fargo for the real estate tax payments it had made in Aleshire's stead.

Responding, Aleshire acknowledged that her plan required funding of $16,986 per month and "that she has not always hit this target during the course of the bankruptcy case." A56. She argued, however, that she would be able to make the target going forward. Social Security and monthly rent from the Willow Road and Walden Road properties, she maintained, would bring her $12,986 each month, and the remaining gap of $4,000 would be covered by rent on the

---

[8] Wells Fargo does not explain the derivation of this calculation, except to say in its reply brief on its objections to the plan that it is the amount of average "monthly balance increase" in Aleshire's accounts through May 2016. Dkt. 154 at 7. Wells Fargo maintains that this number represents the income available to fund the plan because, as shown by the monthly reports and confirmed by Aleshire's counsel during the December 2016 hearing, Aleshire only resumed making mortgage payments to Wells Fargo in "the past three or four months." A9. Had mortgage payments to Wells Fargo been made throughout the case, the "surplus" shown by the operating reports would have been a substantial loss. Using the payment figures set out in the October 2016 report, payments due on the Wells Fargo mortgages totaled approximately $11,554. And the reports show that Aleshire made no mortgage payments to Wells Fargo until September 2016, some 19 months after filing her Chapter 11 petition. Had Aleshire paid the $11,554 in payments to Wells Fargo during those 19 months, the ending balance reflected on the operating report for November 2016 would have shown a deficit of some $188,000 rather than a $30,000 surplus. On a monthly basis, then, the operating reports establish a net deficit in Aleshire's income of more than $8,000 ($188,000/23 months).

Florida property, earnings from a retail job, and contributions from family members who pledged support of up to $2400 each month. Aleshire further explained that her husband had sufficient income to pay for her personal living expenses so her income was fully available to fund the plan. She did not, however, address the more than $300,000 in pre- and post-petition tax payments for which she was obligated to reimburse Wells Fargo.

The bankruptcy court held an evidentiary hearing on Wells Fargo's motions to dismiss on December 5, 2016. At the outset of the hearing, the bankruptcy judge highlighted numerous obstacles to confirmation of the plan, including the pre- and post-petition tax payments owed to Wells Fargo, the requirement for interest only payments for four years, a 34-year payout that would extend well beyond the remaining lifetime of the debtor, application of the absolute priority rule, and the debtor's lack of sufficient income. Judge Doyle summed it up this way (A. 89-90):

> [T]his whole case is problematic in so many ways. . . . A 34-year payout? Interest only for 4 years? . . . So, you know, there is just so many issues out here, and we have a debtor who is just not making enough money to have these properties. I mean, the idea that virtually 8 years of no payments and no paying of taxes prepetition and postpetition. And 90,000 is only postpetition. I think Wells Fargo has paid like, what, 300-plus thousand prepetition and postpetition taxes? I mean, its' a pretty—I don't think I've ever seen a Chapter 11 like this were—this shouldn't be happening, Ms. Aleshire. You cannot keep a bunch of properties just because you want them for your children or something when you're not paying for them and you can't pay the taxes. And you have all these different things happened on all these properties, but the truth is that's what rental properties are like, by the way. They're not just free money. You have to spend a lot of money to keep them up. . . . I am just wondering, you know, why are we going to go through this exercise?

Judge Doyle also identified concerns about the enforceability of many of the agreements on which Aleshire was relying in identifying her sources of income to fund the plan. She questioned reliance on income from the Walden property in the absence of documentation

reflecting an enforceable agreement with the Trustee of the trust that owned the property to provide the rental income from that property to the debtor. She expressed similar concerns about the enforceability of the agreements by family members to provide financial support to the plan.

After highlighting these issues, the judge nevertheless gave Ms. Aleshire the opportunity to testify in support of the feasibility of the plan.[9] That testimony did nothing to allay the concerns the bankruptcy court had expressed. Aleshire confirmed that she had not made mortgage payments to Wells Fargo since July 2008 until she resumed payments in response to Wells Fargo's demand for protection in September 2016.[10] A121. She also testified that:

- She received monthly Social Security benefits of $1,786;

- The trustee of the trust that owned the Walden property had agreed to contribute all of the rent received on that property ($5,000/month) to fund the plan, but that rent fell short by several hundred dollars of what was needed to pay the mortgage and related monthly expenses on that property;

- She had rental bookings (which could be canceled) for the Florida property covering about 10 months of 2017; the bookings totaled about $30,900 and her mortgage payment, inclusive of insurance and taxes, on that property is about $2,684 each month;

- She believed she could, if necessary, rent the Chatfield residence (and move in with her children) for about $3,000 per month, enough to cover the monthly mortgage payment (inclusive of taxes and insurance) of $2,929; and

---

[9] Aleshire has since complained that the evidentiary hearing was held while she was actively undergoing chemotherapy and that "the hearing took an immense physical and emotional toll" on her. A. 192-93. The record makes clear, however, that the evidentiary hearing went forward at Aleshire's request. A. 109 ("But if the debtor wants to go ahead and put on some testimony about any or all of this, I guess we can do that"; *id.* at 110-11 (debtor's counsel: "Your honor, we would like to proceed with our evidence.").

[10] Aleshire testified at length about the reasons she stopped making payments and her unsuccessful attempts to reinstate the loans thereafter. That testimony is not recounted here as it has no relevance to the issues on appeal.

7

- She was looking for employment but did not know when she might be able to begin working because of pending surgery and cancer treatments that had yet to be scheduled.

After a lunch break following Aleshire's testimony, however, the parties informed the bankruptcy judge that they had reached a settlement. The basic terms of the agreement were consistent with a resolution Judge Doyle had suggested at the outset of the hearing (A. 103), providing that the Willow Road and Walden Road properties would be surrendered to Wells Fargo and Aleshire would retain her residence (the Chatfield property) and the Florida property as to which she had already negotiated a loan modification agreement (with Deutsche Bank, the lender on that property). In exchange, Wells Fargo agreed to recapitalize Aleshire's arrearages on the Chatfield property, which would otherwise be subject to the existing terms of the loan. The bankruptcy court scheduled a hearing on January 12, 2017 to confirm a prospective plan that would give effect to the parties' agreement.

A week before the scheduled hearing, however, Aleshire filed a motion for an extension of time to file another amended plan—one unrelated to the parties' agreement on December 5—that would enable her to retain all of her properties. Contemporaneously, Aleshire's counsel sought to withdraw from the representation of Aleshire for one or more unspecified reasons. Wells Fargo responded to Aleshire's motion with a third motion to dismiss, reiterating its prior grounds, and adding a request for a two-year refiling bar.

At the hearing on January 12, 2017, Aleshire's attorney[11] explained that Aleshire, with the assistance of an unidentified "third party company that helps obtain loan modifications," was negotiating a loan modification with Wells Fargo that would allow her to "come up with a

---

[11] The bankruptcy judge did not grant the motion to withdraw by Aleshire's counsel until the conclusion of the January 12 hearing and so counsel continued to represent Aleshire during the course of that hearing. Aleshire has asserted no error in that regard.

8

payment that is going to be manageable." [12] Tr. 1/12/17, Bankr. Dkt. 221, at 5 (Trustee appendix). Wells Fargo's attorney, however, disputed Aleshire's claim that any loan modification was in the offing, noting that Aleshire had not even identified the company assisting her, much less established any realistic prospect for obtaining a modification. Wells further noted that it was being prejudiced by continuation of the bankruptcy case stay, which prevented it from moving forward with state court foreclosure actions, and that continuation of the bankruptcy case was not necessary to facilitate any negotiations concerning a further loan modification. Counsel for the United States Trustee, participating in the hearing, agreed that "[t]he loan modification sounds like a Hail Mary" and stated that the Trustee did not object to dismissal of the case. *Id.* at 9.

After hearing the parties' arguments, the bankruptcy judge denied Aleshire's motion for an extension of time to present a fourth amended plan and granted Wells Fargo's motion to dismiss the case. The court first noted that Aleshire had no ability to pay the post-petition taxes owed on the properties, "which is an administrative expense that the debtor would have to pay upon confirmation. Utterly impossible. The debtor hasn't been able to pay anything." Tr. 12. For that reason alone, she concluded, Aleshire could not confirm a plan. She therefore declined to "let this case go on with you having the benefit of the automatic stay without having done

---

[12] In her reply brief on appeal, Aleshire identifies the company she consulted with regarding possible loan modifications with Wells Fargo as "Homestead Financial Services," and says that the company "guaranteed that they had contacted Wells Fargo and had worked out modification that would allow her to retain her three properties with Wells Fargo." Reply at 3. This information is inconsistent with the position Aleshire took in the January 12 hearing to the extent that she claims that the consulting company had advised her that modifications had, in fact, been obtained; in her motion for an extension of time, and at the January 12 hearing, Aleshire represented only that the company had initiated communication about a modification but a modification had not yet been secured. A. 193 (modification is "possible"); Tr. at 4 ("they can get this done").

9

anything close to what you need to do to have a confirmable plan." Tr. 19. The bankruptcy judge also concluded that, in light of Aleshire's intention to hold on to all of the Winnetka properties, "[there] is no confirmable plan here. There is not enough income to support a plan; the numbers don't work." Tr. Jan. 12, 2017 at 15. Accordingly, the bankruptcy court entered an order dismissing the case and barring Aleshire from refiling for 180 days.

Aleshire then filed a timely appeal. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a)(1).

## II. ANALYSIS

The issue presented by this appeal is whether the bankruptcy judge abused her discretion in dismissing Aleshire's chapter 11 petition.[13] Section 1112(b)(1) of the Bankruptcy Code (11 U.S.C. § 1112(b)(1)) provides that a chapter 11 petition should be denied (or converted to a chapter 7 proceeding) upon a showing of "cause." Here, the bankruptcy court identified two bases to dismiss Aleshire's petition for cause: Aleshire's inability to pay post-petition taxes on the properties in her estate and her inadequate income to fund a plan that included retention of all of the properties in her estate. Either of these reasons independently justified the dismissal of Aleshire's petition (which had been pending for more than two years when the bankruptcy judge dismissed it); in combination, the argument that the bankruptcy judge abused her discretion borders on the frivolous.[14]

---

[13] In dismissing Aleshire's petition, the bankruptcy court also imposed a 180-day filing bar, precluding Aleshire from filing any further chapter 11 petitions during that period. That bar has expired, however, so to the extent that Aleshire's appeal challenges the imposition of a filing bar, that issue is moot.

[14] Aleshire's brief lists nine issues for review, but she failed to raise a number of them in opposing dismissal of her complaint in the bankruptcy court and has therefore waived those arguments. Specifically, Aleshire did not raise in the bankruptcy court the third issue (challenging the validity of Wells Fargo's proof of claims), eighth issue (homestead exemption

10

## A. Post-Petition Taxes

Aleshire does not dispute that, when the court dismissed her petition, she owed Wells Fargo approximately $90,000 in post-petition real estate taxes that the bank had paid to prevent tax liens on the properties. Section 1112(b)(4)(I) of the Bankruptcy Code specifically provides that the failure to pay post-petition taxes is cause for dismissal of a chapter 11 petition and certainly the bankruptcy judge did not abuse her discretion in dismissing the petition when it is undisputed both that Aleshire owed the amount of the tax payments to Wells Fargo and that she did not have the resources to pay that obligation in full upon confirmation of the plan.

Aleshire's sole argument in opposition to dismissal on this basis is that the property was not at risk of forced sale due to her delinquency in paying property taxes—in other words, that Wells Fargo didn't have to make the tax payments in order to protect its interest in the properties.[15] She offered no support for that claim in the bankruptcy court hearing, however, and in any event whether she is right or not on that question is irrelevant. As both the Trustee and Wells Fargo point out, the bankruptcy code does not condition dismissal for failure to pay post-petition taxes on the risk of foreclosure; rather, § 1112(b)(4)(I) states that cause for dismissal

---

on the Chatfield property), and ninth issue (alleging that an attorney representing Wells Fargo had a conflict of interest) she identifies in her brief. In any event, these arguments have no merit for the reasons set forth in Wells Fargo's brief. Wells Fargo Resp. at 7-8, 14-15. Further, Aleshire's first identified issue—relating to Harris Bank's filing of a late proof of claim—has nothing whatsoever to do with the bankruptcy court's dismissal of Aleshire's petition and so has no relevance to this appeal.

[15] Aleshire also maintains that the bankruptcy court erred in determining that unpaid post-petition taxes represent an "administrative expense" that constitutes a priority claim. She cites no authority in support of that contention, however, which seems to be at odds with 11 U.S.C. § 503(b) (property taxes are an administrative expense of the estate) and § 507(a) (claims under § 503(b) are entitled to priority). In any event, this contention is, as aptly characterized by Wells Fargo, a "red herring" because whether or not unpaid property taxes are classified as an administrative expense, under § 1112(b)(4)(I) they constitute cause for dismissal of a chapter 11 petition.

exists whenever there is a "failure to timely pay taxes owed after the date of the order for relief." Further, even if the properties were not at risk when Wells Fargo paid the post-petition property taxes, Aleshire would still be required to reimburse Wells Fargo for the amounts paid, and she never proposed any plan that offered any program, much less a realistic one, for doing so. In short, beyond the arrearages on her mortgage payments, Aleshire owed Wells Fargo an additional $90,000 based on those post-petition tax payments and had no realistic means of paying that debt. There was, therefore, cause for a dismissal on this basis and no abuse of discretion in dismissing the petition on this basis.

### B. Failure to Propose a Confirmable Plan

Under Chapter 11, an individual debtor is required to file and confirm a plan for reorganization "as soon as practicable." 11 U.S.C. §§ 1106(a)(5) and 1107. And failure to confirm a plan itself constitutes cause for dismissing a chapter 11 petition. 11 U.S.C. § 1112(b)(4)(J).

It is undisputed that Aleshire failed to obtain confirmation of a plan. Indeed, when the bankruptcy judge dismissed her petition, Aleshire did not even have a plan pending. At the evidentiary hearing on Wells Fargo's motion to dismiss, Aleshire maintained that her third amended plan was feasible, but she abandoned that plan during the hearing when she reached an agreement with Wells Fargo to surrender her interests in two of the properties in exchange for default forgiveness on the mortgage to the Chatfield property, her residence. Based on the reported agreement, the bankruptcy court directed Aleshire to file a fourth amended plan that would implement that agreement, but she failed to do so. Instead, she asked for additional time to file yet another iteration of a plan that would allow her to retain all of the properties in her estate, claiming that she had begun working with a service to obtain loan modifications from Wells

Fargo that would allow her to retain the properties. Wells Fargo, however, advised the court that no loan modifications were in the offing and that Aleshire was simply seeking to further delay the dismissal of her petition. In light of Wells Fargo's opposition, and in response to Aleshire's request for more time to pursue loan modifications, Judge Doyle reasonably pointed out that it was futile to continue pressing forward to confirm a plan in bankruptcy that required Wells Fargo's agreement:

> [T]he only way that can happen is by agreement. Wells Fargo has to agree. They don't want to agree. They do not have to. There's no way I can compel them. Why not just let the case get dismissed and the debtor pursues that [loan modification] outside of bankruptcy, because that is completely independent of bankruptcy. . . . So you just cannot do this in a bankruptcy without the agreement of the other side. And, obviously, you don't have that.

Tr. Jan. 12, 2017 at 9, 16.

The bankruptcy court was well within her discretion to reject Aleshire's gambit, which the judge fairly characterized as "stringing creditors along," *id.* at 18, and to dismiss the petition. The petition had at that point had been pending for more than two years and, as Judge Doyle concluded, it would have been inequitable to allow Aleshire to "just keep throwing the ball someplace else and figure, you know, that's all right." *Id.* at 15. The judge rightly concluded: "It is not all right. Two years and your third bankruptcy case, your second Chapter 11. This has gone on way too long." *Id*. "[A] debtor cannot wallow in chapter 11 indefinitely." *In re Brooks*, 488 B.R. 483, 490-91 (Bankr. N.D. Ga. 2013) (dismissing petition where confirmation of plan was not imminent after one year). "[B]ankruptcy courts are given a great deal of discretion to say when enough is enough." *Matter of Woodbrook Assocs.*, 19 F.3d 312, 322 (7th Cir. 1994). After two years, and in response to Aleshire's request for still more time to pursue her quixotic objective of preserving all of her rental properties, Judge Doyle exercised that discretion reasonably in this case when she said, "Enough."

Aleshire complains that the bankruptcy court should have granted her a further extension based on her health and age, but that call, too, was within the bankruptcy court's discretion—*see* Fed. R. Bankr. P. 9006(b)(1)—and Judge Doyle did not abuse her discretion in denying a further extension of time to Aleshire on the basis of Aleshire's health or age. Again, Aleshire had two years to put together a plan and, as set forth herein, the bankruptcy judge reasonable determined that the prospect that Aleshire would secure loan modifications from Wells Fargo or otherwise develop sufficient income to fund a plan that creditors (principally, Wells Fargo) would confirm were dim (to put it mildly). And to the extent that Aleshire is claiming that the bankruptcy judge treated her unfairly, or was not sufficiently solicitous of her health problems, the claim has no merit whatsoever. The record reflects numerous extensions were granted to Aleshire for reasons relating to her health and otherwise. *See, e.g.*, Dkt 88 (granting motion to extend time to file disclosure statement); 148 (granting motion to extend time to file ballot report); 157 (delaying continuation of confirmation hearing due to Aleshire surgery); 225 (transcript of hearing on 8/16/16: "I certainly will continue [the confirmation hearing] given Ms. Aleshire's health"); 226 (transcript of hearing on 8/30/16, granting in part an oral request for extension of confirmation hearing based on Aleshire health and absence of creditor counsel, but noting "as much as I'm sympathetic with Ms. Aleshire, . . . I can't see just keeping the case here and lettering her have the automatic stay. . . . I have debtors who are sick, debtors who are on their . . . last days and weeks of lives sometimes where we just can't keep them in bankruptcy forever while they get better."). The record also reflects that Judge Doyle accommodated Ms. Aleshire's pending surgery in setting the January 12, 2017 hearing date to confirm the agreed-upon resolution of the

case (A. 103), and along the way the judge expressed considerable sympathy for Aleshire's plight.[16]

All that said, it must also be noted that Aleshire's claim to need accommodation for her physical condition and ongoing need for treatment and rest in order to propose another confirmation plan is fundamentally at odds with the representations she made in defense of her third proposed plan regarding her ability to locate and resume full-time employment in order to supplement her income. Aleshire's assertion that granting her further time to confirm a plan would not prejudice creditors, moreover, is baseless; creditors like Wells Fargo are necessarily prejudiced when they go years without receiving timely payments that the debtor promised to provide. The prejudice to Wells Fargo was particularly acute, because this was Aleshire's second chapter 11 petition arising from her inability to meet the mortgage payments on various properties.

In any event, the bankruptcy judge did not dismiss Aleshire's petition simply because it had been pending too long; she also concluded that there was no realistic prospect that Aleshire would *ever* be able to confirm a plan given her limited resources. Aleshire takes issue with that assessment, asserting that she "makes more than enough income to support the mortgages," but in the bankruptcy court she was unable to demonstrate that she could have made all of the payments required by her own proposed plan (much less payments that would have satisfied Wells Fargo). Notwithstanding her unsupported contention in responding to Wells Fargo's objections to her third amended plan that she had monthly income of some $16,986 to fund the

---

[16] *See, e.g.*, A. 105 ("I certainly have sympathy for any debtor, and I know you're battling cancer"); Tr. Jan. 12, 2017 at 12-13 ("It's so unfortunate, you know, illnesses, the treatment, you know, for all of those things. And I want you to know, Ms. Aleshire, I'm very sympathetic, but you also have this daunted determination that you must keep these properties no matter what, no matter that they're under water and you can't afford them.")

plan (which she acknowledged was not sufficient to make all required payments without a modification of one of the loans), her testimony at the hearing, even if fully credited, established monthly income of only $12,876.[17] The operating reports that Aleshire filed, moreover, demonstrated that Aleshire's actual income deficit was something on the order of $8,000 per month. And that deficit did not, as noted above, take into account Aleshire's obligation to reimburse Wells Fargo for the $90,000 in post-petition taxes paid.[18]

Aleshire painted an optimistic picture of her ability to make up any deficit in her monthly income, but that picture, as the bankruptcy judge noted, was sketchy and drawn with pencil rather than ink. First, Aleshire testified that the trustee of the Walden property, of which she was not the owner but just one of seven beneficiaries (the others being her six children (A. 92), had promised that all rental income derived from that property would be provided to her but there was no formal agreement to that effect. Nor, as Wells Fargo points out, did Aleshire ever present documentation demonstrating that such an assignment of the trust's income to a single beneficiary was permissible. Aleshire also maintained that she would be able to secure more rentals at peak rates for her Florida property, but that assessment was speculative in light of the rental history and because Aleshire's projections were based on agreements that were still subject to cancellation and requirements to refund deposits and failed to factor in maintenance costs and other associated expenses of managing rental properties. Aleshire maintained that she would secure personal employment and devote her salary to the Wells Fargo loans, but the

---

[17] $1786 (social security) + $5,000 (income from Walden property trust) + $3,090 (rental income from Florida property) + $3,000 (rental income from Chatfield property if Aleshire moved in with children and rented the property) = $12,876/month.

[18] In addition to Aleshire's income deficit, moreover, the bankruptcy judge noted that the proposal to make interest only payments on some of the loans for the first four years and to extend the loans to 34 years were also problematic aspects of Aleshire's proposed plan. *See, e.g.*, A. 89, 104.

operating reports she filed report no income at all from any employment during the pendency of her petition. Her prospects of quickly securing employment, moreover, were belied by the fact, which she also acknowledged, that she had surgery and ongoing cancer treatments pending over the next several months and could not definitively say when she would return to the workplace, much less where or what she would earn when she did so.[19] Finally, Aleshire also provided affidavits from some of her children pledging their financial support, if needed, but the bankruptcy judge was justifiably skeptical that, however, well-intentioned, Aleshire's family would be willing to fund mortgage payments to Wells Fargo for the next 34 years (the term of the modified agreements proposed by Aleshire's third amended plan), a term that would almost certainly extend beyond Aleshire's lifetime. And as the bankruptcy court observed, the affidavits provided no specifics about how much support would be provided, or how, or by whom, over that period. It was no abuse of discretion for the bankruptcy judge to conclude that these additional income sources were too uncertain to support confirmation of a plan in which Aleshire would retain all three of the Winnetka properties.

Aleshire says that the bankruptcy judge employed the wrong standard in assessing her ability to fund a confirmable plan, in that she looked for a "guarantee" that Aleshire would have the resources to fund the plan. That is simply untrue. Rather, Judge Doyle found that Aleshire had a demonstrated inability to fund the plan over the two years her petition was pending and that there was virtually no basis on which to conclude that her ability to fund a plan had suddenly

---

[19] Aleshire also complains in her Reply brief that income from her employment at Lowe's [hardware store] had not been factored into the assessment of whether she had sufficient income to fund the plan. Aleshire's operating reports, however, include no income from employment at Lowe's or elsewhere. Further, Aleshire admitted during her testimony that she was "really not in a position to be able to work at this time" and it was clear that her prognosis for returning to work for an employer was quite uncertain.

17

improved materially—particularly in light of her obligation to pay more than $90,000 in post-petition tax payments on top of funding her mortgage obligations. It was, in Judge Doyle's view, "utterly impossible" for Aleshire to fund a confirmable plan. Plainly, then, she did not hold Aleshire to the wrong standard of certainty; she granted Wells Fargo's motion to dismiss not because she was uncertain whether Aleshire could confirm a plan but because she was certain that Aleshire could not.

Judge Doyle's assessment—"[t]here is no confirmable plan here. There is not enough income to support a plan; the numbers don't work"—was not an abuse of discretion.[20] Nor was her conclusion, in light of Aleshire's inability to obtain loan modifications from Wells Fargo during the preceding two years while her petition had been pending and Wells Fargo's position that no modifications of Aleshire's loans were forthcoming, that there was no reason to anticipate that, with still more time, Aleshire might be able to put together a feasible plan. After two years, it was time to say, "enough"—and the bankruptcy judge did so.

\* \* \* \* \*

For the foregoing reasons, the bankruptcy court's order of January 12, 2017, is affirmed.

Dated: July 9, 2018

John J. Tharp, Jr.
United States District Judge

---

[20] And to the extent that this determination rests on a factual finding that Aleshire's income is inadequate to fund the third amended plan she proposed, that finding was not clearly erroneous.